**RECEIVED**

FEB 2 6 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| JODY MECHE, ET AL | CIVIL ACTION NO. 05-0385 |
| VERSUS | JUDGE DOHERTY |
| GLENN RICHARD | MAGISTRATE JUDGE METHVIN |

## ADDITIONAL WRITTEN REASONS FOR RULING ON EVIDENTIARY HEARING

### Procedural History

Before this Court is a Motion to Dismiss [Doc. 85] by filed by the defendant, who requests this Court to dismiss the matter for lack of admiralty jurisdiction arguing admiralty jurisdiction does not exist as: (1) the tort must have occurred on or over navigable waters, which do not include Lake Rycade; and (2) the activities giving rise to plaintiffs' claims lack a sufficient nexus to traditional maritime activity such that the incident has no potentially disruptive influence on maritime commerce. In response, plaintiffs filed an opposition, arguing admiralty jurisdiction exists as to this case because the Lake Rycade waters where the tort occurred is navigable and because defendant's actions bear a substantial relationship to traditional maritime activity.

Consequently, from October 23, 2006, through November 3, 2006, this Court held an evidentiary hearing on the factual issues inherent within the first prong of the determination regarding whether or not the Lake Rycade area where the tort occurred is navigable. At the conclusion of the hearing, this Court found Lake Rycade to be navigable in fact and provided oral reasons for the ruling, subject to this Court's right to supplement those reasons with full written reasons.

1

This Court's finding of fact, conclusions of law and determination of Lake Rycade's navigability will be adopted and made a part of the overall determination of whether admiralty jurisdiction exists and more particularly whether the activity giving rise to plaintiffs' allegations has a sufficient connection to traditional maritime activity to support admiralty tort jurisdiction.  As to the issue of whether Lake Rycade is navigable, this Court supplements its oral finding of fact, conclusions of law and ruling as follows.

<em>Factual Allegations</em>

On March 2, 2005, plaintiffs filed a complaint [Doc. 1] alleging that, on or about February 5, 2005, they were "frogging" in a twenty foot boat powered by an eighty-eight horsepower outboard motor in Lake Rycade, a body of water that is "navigable in fact."  Plaintiffs allege the lake is susceptible of navigation and is connected to the Whiskey Bay Pilot Channel, which is connected to the Atchafalaya River that flows into the Gulf of Mexico.  Therefore, they allege, these bodies of water form a continuous highway on which commercial activity can and does take place.

Plaintiffs indicate on the date of the alleged tort, they accessed the lake from the Whiskey Bay Pilot Channel, and were looking for frogs after dark when they heard a rifle shot and observed a bullet strike the water near the boat in which they were riding.  Plaintiff, Jody Meche, alleged he observed the location of the shooter and then called his wife to tell her he was under fire.  Meche claims he ordered his two sons to get down and began yelling at the shooter to cease fire.  Plaintiffs allege they approached the location of the shooter, where they came upon defendant, who was holding a rifle.  Plaintiffs claim they asked defendant why he was shooting at them, to which defendant responded plaintiffs "were on private property and he wanted them out of the lake."

2

# LAW

The parties have agreed, and this Court finds, that the primary base for the applicable law is the Fifth Circuit case of *Sanders v. Placid Oil Company*, 861 F.2d 1374 (5th Cir. 12/22/88). In *Sanders*, the Court initially observed, " Federal admiralty jurisdiction exists giving a court jurisdiction over a dispute if the tort occurs on navigable waters and the tort bears a significant relationship to traditional maritime activity." 861 F.2d 1376-1377 (citing *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, (1982)). Further, according to the *Sanders* Court, the Supreme Court enunciated the test for navigable waters:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.

861 F.2d at 1377 (citing *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871)). The Court added the test has subsequently been held to apply to all bodies of water, not just rivers, natural as well as artificial. *Id.* (citing *Ex Parte Boyer*, 109 U.S. 629, 632, 3 S.Ct. 434, 435, 27 L.Ed. 1056 (1884)).

Therefore, following the analysis set forth in *Sanders,* the factors to which this Court looks to determine whether or not Lake Rycade is navigable in fact are: whether or not Lake Rycade is used, or susceptible of being used, in its ordinary condition, as a highway of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water; and whether the waters of Lake Rycade form in their ordinary condition by themselves, or by uniting

3

with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.[1]

It is noted the parties have argued nuances as to the foregoing applicable law.  For instance, the parties have raised the issues of: (1) whether seasonal nonnavigability renders Lake Rycade nonnavigable as a matter of law; (2) whether the actual use of Lake Rycade as part of the highways of commerce or a historical consideration of Lake Rycade's ability or susceptibility of such use should apply to the analysis of Lake Rycade's navigability in fact; and (3) whether impediments to Lake Rycade's access render Lake Rycade nonnavigable.

(1)     *Whether seasonal nonnavigability renders Lake Rycade nonnavigable as a matter of law.*

Defendant appears to argue that seasonal nonnavigability renders Lake Rycade nonnavigable as a matter of law.  However, in *Sanders*, the Fifth Circuit rejected that argument, noting that navigable bodies of water, including the Mississippi River and the St.  Lawrence Seaway, are nonnavigable in winter.  861 F.2d at 1376-1378.  Accordingly, while the testimony in this matter has established access to Lake Rycade is available only seasonally, that fact in and of itself does not preclude a finding that Lake Rycade is navigable.  Therefore, following the analysis set forth in

---

[1]The Court notes that there appears to be no dispute that the waters surrounding Lake Rycade, including the waters of the Atchafalaya Basin, the Atchafalaya River, and the Whiskey Bay Pilot Channel, constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States. Specifically, there is no dispute that these bodies of water form in their ordinary condition by themselves, and unite with other waters, including the Mississippi River, a continued highway over which commerce, including hunting, fishing and oil and gas commerce, is or may be carried on, as those waters flow from around the country through the Atchafalaya Basin region of lakes and rivers, into Vermillion Bay, and thereafter into the Gulf of Mexico. Even if one were to suggest the Atchafalaya Basin, the Atchafalaya River, and the Whiskey Bay Pilot Channel were not parts of the highways of commerce, there was testimony brought before this Court which would establish the bodies of water are, in fact, parts of the highways of commerce of the United States of America.

*Sanders*, this Court declines defendant's invitation to conclude seasonal nonnavigability renders waters nonnavigable as a matter of law. The Court bolsters that opinion by the finding that, in fact, the number of days when the waters are navigable coincide with crawfish season, which is the activity of commercial nature that is the most likely to be used for that area and the time period when the area is most likely to be used as a highway of commerce to move across the Atchafalaya Basin.

    (2)    *Whether the actual use of Lake Rycade as part of the highways of commerce or a historical consideration of Lake Rycade's ability or susceptibility of such use should apply to the analysis of Lake Rycade's navigability in fact.*

With respect to navigability in fact of Lake Rycade, the defendant argues that "actual use" of the waters as highways for commerce should apply, primarily relying on matters arising in other jurisdictions. On the other hand, the plaintiffs aver a historical consideration of the "ability or susceptibility for use" of the waters as highways for commerce should apply, relying on *Sanders, supra*, wherein a historical consideration was used to resolve the navigability issue.

As to this limited issue, this Court notes substantial factual similarities between this case and *Sanders, supra*, and also notes it is bound to follow Fifth Circuit jurisprudence. In *Sanders*, the Fifth Circuit faced opposing arguments on this issue and considered percentages of time during specific ranges of years in which a body of water was navigable. The Fifth Circuit rejected the defendant's attempt to limit the time frame and looked to a more broad period of time to resolve the issue of navigability. 861 F.2d at 1377.

Likewise, this Court was presented with opposing arguments on this issue as well as evidence of percentages of time during specific ranges of years in which a body of water was navigable. Of particular interest for this Court was the unanimity of opinion among the experts presented by plaintiff and defendant as to an 18.6-year period of time relevant to consider the navigability of Lake

5

Rycade. The expert opinions were not only persuasive, but they were supported by the testimony of Mr. Bienvenu the expert commercial fisherman put forth by the plaintiffs, as discussed more thoroughly on the record.

Accordingly, this Court declines defendant's limitation of the relevant time frame and instead looks to a broader period of time to resolve the issue of navigability. Specifically, noting the testimony describing the unique nature of the Atchafalaya Basin itself, this Court will look to an historical consideration of 18.6 years, which was the period of time over which the experts on behalf of plaintiff and defendant both agreed, to resolve the issue of navigability.

Additionally, it has been suggested by defendant that Lake Rycade should be construed as nonnavigable because tug boats and barges could not access Lake Rycade. In that respect, this Court finds of particular interest the Supreme Court decision in *The Montello*, 87 U.S. 430 (1874), in which the Supreme Court considered the navigability of a body of water and specifically set forth:

> [T]he true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which rafts of lumber of great value are constantly taken to market.

> It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway. The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable in its natural state of being used for purposes of commerce, *no matter in what mode the commerce may be conducted*, it is navigable in fact, and becomes in public river or highway. *Vessels of any kind that can float upon the water*, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted, and it would be a mischievous rule that would exclude either in determining the navigability of a river. *It is not, however, as Chief Justice Shaw said, 'every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or*

*agriculture.'*

87 U.S. at 440-442 (internal citations omitted, emphasis added)

This Court notes the manner and mode of access to the Lake Rycade area is often times in a manner and with a mode of transportation that is unique to the Atchafalaya Basin itself and is one which has been developed for and adapted to the unique nature of the Basin and the unique nature of the commerce conducted within the Atchafalaya Basin. The hearing testimony, as discussed on the record, indicates modes of transportation, including "go-devils," "bateaux," "pirougues," and other types of transportation designed to specifically traverse the Atchafalaya Basin waters, are commonly used in the area and used for commercial fishing and trapping. Those modes of transportation may not be "sailboats and steamboats," following the analogy in *The Montello,* but they are nonetheless vessels used for travel and transporting materials and product within the Atchafalaya Basin, and for commercial fishing and trapping within the Atchafalaya Basin and Lake Rycade itself and thus, "generally and commonly useful to some purpose of trade or agriculture." Further, this Court notes the unique situation of the Lake Rycade area, situated in between two major commercial waterways, thus providing, when access is not illegally blocked, for a "short cut" when moving east to west and west to east. See testimony of Steven Meche.

Further, this Court notes the testimony of the witnesses, including Mr. Bienvenu, who specifically described national and international markets where products the result of the commercial fishing and hunting conducted in the Atchafalaya Basin are sold evidencing trade and commerce. Consequently, this Court, in following the analysis set forth in *The Montello, supra,* considers the Lake Rycade area "generally and commonly useful to some purpose of trade or agriculture."

Additionally, of particular interest to this Court in matter of *The Montello* is that the Supreme

7

Court found navigability could be established on the basis of historical records of commercial navigation going as far back as 1673. The Supreme Court based its finding of navigability relying on evidence that the Fox River was traveled by explorers in the seventeenth century, used by fur trappers in the eighteenth century, and used as an artery of commerce by animal-drawn Durham boats in the nineteenth century. 87 U.S. at 439-445. The consideration by the Supreme Court is of particular interest in this matter because this Court found the rich and colorful history of Lake Rycade and the Atchafalaya Basin to be significant as fully explained through testimony and reasons given on the record. The Atchafalaya Basin, historically has supported a social structure and society interwoven and interdependent upon the unique waterways of the Atchafalaya Basin. Children have gone to school by way of the waterways, livelihoods have, for generations, been made in the Atchafalaya Basin waters, product has been taken to market over the waterways and travel has, by necessity within the Basin, been by boat. And testimony was clear Lake Rycade historically has been a part of this social dynamic. Likewise, this Court found the history of "slough B," or "Meche Bayou," itself is significant as fully explained on the record.

The Court, however, also, appreciates commentary regarding the distinction between the concepts of "contemporary navigability in fact," which requires evidence of ongoing or reasonably likely commercial activity, as opposed to "navigational capacity," which requires only that commerce be possible. Specifically, according to one commentator:

> The strongest argument advanced in favor of the navigational capacity standard, and against the contemporary navigability-in-fact standard, is that a definition based on the presence or absence of commercial activity is unstable.

John F. Baughman, *Balancing Commerce, History and Geography: Defining the Navigable Waters of the United States*, 90 Mich. L. Rev. 1028, 1045-1046 (1992). By way of example, the author

notes the following comment by the Sixth Circuit:

> [I]f current or present commercial maritime activity is the test, a ferry could operate on Dale Hollow Lake between Kentucky and Tennessee one day and go out of business the next and tortious occurrences happening on each of the two days would be subject to different rules of conduct and liability.

90 Mich. L. Rev. at 1047-1048 (citing *Finneseth v. Carter*, 712 F.2d 1041, 1047 (6th Cir. 1983)). The author further observes the instability "causes significant problems for courts applying the contemporary navigability-in-fact standard," and as a result, "decisions have turned on such trivial facts as whether or not the post office used a boat to deliver the mail." *Id.* Additionally, the author further points out that a "definition of navigability based on the amount of commerce also leads to problems in dividing a waterway into navigable and nonnavigable sections," which is problematic for cases "arising on inland rivers and lakes with potentially navigable outlets and tributaries." *Id.*

This Court finds the foregoing of particular interest because this matter arises within the Atchafalaya Basin, which, according to the testimony presented is a dynamic and constantly evolving system of many inland rivers, channels and lakes with many potentially navigable outlets and tributaries. Consequently, the very unique nature of the Atchafalaya waters presents a challenge in dividing those waters into navigable and nonnavigable sections.

Moreover, this Court is intrigued with outcomes based on the application of the contemporary navigability in fact concept to the facts in this matter. Specifically, there was testimony indicating fishermen and hunters within the Atchafalaya Basin refrain from commercial hunting or fishing in an area not because the water is unable in its ordinary condition to be susceptible of use as a highway of commerce, but because illegal barriers have been put to impede and deny access and hunters and fishermen fear of being fired upon by armed individuals.

9

Accordingly, following defendant's actual use or contemporary navigability in fact analysis, waters conceivably could become nonnavigable simply as a result of unlawful behavior which was directed precisely at interfering with the use of the waters as highways of commerce. That is not an argument or result this Court is willing to accept.

Likewise, where as here, there is evidence indicating individuals unlawfully interfered with unfettered access to a body of water being used as a highway of commerce, by intentionally placing obstacles and debris to frustrate navigability, a body of water could be considered nonnavigable merely because an unlawful individual simply desires to interrupt the flow of commerce unlawfully. As in the foregoing situation involving armed individuals, navigability then would turn not on whether waters may be used, or are susceptible of being used, *in their ordinary condition*, as highways for commerce; rather navigability would turn on unpredictable, unforeseen, and unlawful behavior of anonymous individuals. Otherwise navigable waters could be magically transferred into private property by anyone with a bulldozer, debris and illegal intent. Accordingly, this Court is inclined to agree with commentary suggesting that the contemporary navigability in fact concept could lead to unstable and undesirable results particularly when presented with facts similar to those before this Court.

Additionally, this Court finds support for a conclusion that the contemporary navigability in fact analysis leads to uncertainty in the Fifth Circuit opinion of *Richardson v. Foremost Ins. Co.*, where the Court explained:

> It would be introducing another note of uncertainty to hold that admiralty jurisdiction extends only to a stretch of navigable water that presently functions as a commercial artery. Jurisdiction should be as readily ascertainable as courts can make it. If the waterway is capable of being used in commerce, that is a sufficient threshold to invoke admiralty jurisdiction.

641 F.2d 314, 316 (5th. Cir. April 2, 1981).

In view of the foregoing, to resolve the issue of Lake Rycade's navigability in fact, this Court applies an historical consideration of Lake Rycade's ability or susceptibility of use as part of the highways of commerce.

    (3)    *Whether impediments to Lake Rycade's access render Lake Rycade nonnavigable.*

The parties in this matter also raised arguments with respect to the passage to Lake Rycade via bodies of water that were impeded by manmade obstacles years ago, rendering passage possible only during specific stages of water levels. This Court finds of particular interest the *Sanders* matter in which the Fifth Circuit considered a body of water dammed by a weir that rendered passage possible only at a specific flood stage, namely 36 feet above sea level.

The Fifth Circuit specifically observed, "In short, then, navigable waters of the United States are those waters capable, in fact, of navigation in interstate travel or commerce, and distinctions between natural and man-made bodies of water are immaterial." The Court concluded the weir, "although permanent, is not a constant obstruction to navigation, as indicated by our previous review of the percentages of navigable access." In making its conclusion, the Fifth Circuit reviewed "affidavits as testimony of three individuals who claimed to have navigated through Catahoula Lake after the Corps' construction projects were completed." 861 F.2d at 1377-1378.

Additionally, the Fifth Circuit in *Sanders* discussed the U.S. Army Corps of Engineers' determination that the Little River and Catahoula Lake were navigable waters of the United States. Specifically, the Corps of Engineers maintained structures throughout the system and required Placid to have a permit that governs the placing of structures in those waters. Although these determinations were not controlling, the Fifth Circuit found the district court correctly concluded

11

that, "from an evidentiary point of view, they are significant." 861 F.2d at 1378.

Following the guidance of the Fifth Circuit, this Court concludes the impediments to accessing Lake Rycade were place without permit, are not a constant obstruction to navigation, based upon a review of the percentages of navigable access, as discussed more thoroughly on the record. In rendering a conclusion, this Court looks to the testimony of various witnesses who indicated they have or have not been able to travel from the Whiskey Bay Pilot Channel into Lake Rycade through Meche Bayou and from the Atchafalaya Basin into Lake Rycade through Bayou LaRompe, and traversing across Lake Rycade thus creating a "shortcut" for travel through the Atchafalaya Basin waters.

Additionally, this Court notes the testimony of Mr. Mason, who worked for the Wildlife and Fisheries Department of the state of Louisiana for approximately 26 years through his retirement in 1990. He was of the opinion that Lake Rycade was navigable and therefore could not be obstructed, in part because the state, through the Wildlife and Fisheries Department, determined it was navigable and spent substantial financial and other efforts at eliminating or otherwise reducing the growth of vegetation that impeded access to the lake. Nevertheless, this Court notes pursuant to *Sanders*, that, while the findings and determinations of the Wildlife and Fisheries Department are not determinative, they are significant from an evidentiary standpoint.

## FINDINGS OF FACT

### 1.    Credibility of the Witnesses

This Court has carefully considered and evaluated the rationality and consistency of the testimony of all the witnesses and the manner in which their testimony supported or detracted from other record evidence. In doing so, this Court has taken into account all relevant, probative and

12

available evidence and analyzed and assessed its cumulative impact on the record contentions regarding Lake Rycade's navigability.

This Court was favorably impressed with the testimony of Steven Meche, Jody Meche, Mr. Guidry, Mr. Bienvenu, and Mr. Mason, all of whom provided compelling and persuasive testimony. Mr. Steven Meche persuasively demonstrated immense familiarity with the Atchafalaya Basin and the Lake Rycade area, having grown up on the banks of the waters in the Lake Rycade area in a house that literally fell into the waters due to erosion. Mr. Steven Meche recalled vivid memories of commercial fishing and hunting in Lake Rycade over a span of more than 40 years back through the 1950s, when he was a child growing up in the area that was originally called Lake Bouillon. His testimony is buttressed by the exhibits indicating Lake Rycade was in fact designated Lake Bouillon in the 1950s and thereafter.[2]

Mr. Steven Meche's testimony was not only buttressed by the exhibits introduced at the hearing, but it was also supported by Jody Meche, whose testimony this Court found to be wholly credible. Steven Meche recalled accessing Lake Rycade seasonally through Slough B when the waters were approximately 14 or 15 feet, or lower if using a go-devil, as did Jody Meche. Likewise, Mr. Steven Meche described using Lake Rycade as a means of traversing the Atchafalaya Basin for commercial fishing, as did Mr. Mason, who also spent much of his life in the Atchafalaya Basin.

---

[2] The Court notes there were attempts to impeach Mr. Steven Meche's credibility, particularly with an affidavit Mr. Meche signed in a separate but somewhat related matter; however, this Court found the affidavit failed to detract from Mr. meche's credibility in any way. Mr. Meche candidly acknowledged his signature, making no attempt to evade the fact he signed the document. He credibly testified he did not understand the language in the affidavit, and explained the circumstances of its creation, and a review of the affidavit reveals language of a legal nature that is simply inconsistent with the language used by Mr. Meche. This Court found the affidavit of no moment and certainly found that it in no way diminished Mr. Meche's lifelong familiarity and experience with commercial fishing and hunting in the Lake Rycade area.

Steven Meche described an historical cycle in which there is an approximate three-month period each year in which Lake Rycade may be accessed from the Whiskey Bay Pilot Channel through Slough B, and his description was bolstered by the consistent testimony of Mr. Bienvenu and is also illustrated in Joint Exhibit 3.

This Court also found the general testimony of the experts on behalf of plaintiff and defendant to be credible; however, this Court was more favorably impressed with the testimony of Dr. Kemp, whose qualifications and experience were quite impressive. Dr. Kemp demonstrated much more familiarity with the lower Atchafalaya Basin region that encompasses Lake Rycade, where he had extensive experience with the Army Corps of Engineers. Further, Dr. Kemp's description of Lake Rycade as a perched pond in which periods of falling water actually extend access through Lake Rycade is supported by Jody Meche, who provided consistent testimony that falling water allows longer access through the lake. Likewise, the testimony of Dr. Kemp and Jody Meche was consistent in noting the water gauge in the Atchafalaya Basin does not precisely indicate when Lake Rycade may be accessed as a result of the longer periods of access during times when water is falling.

On the other hand, Mr. Wolfe, on behalf of defendant, candidly admitted he had never been to the Lake Rycade area in preparation of his evidence for this Court's review. Mr. Wolfe indicated he relied upon information and maps which were quite dated and which were prepared for only general use. Consequently, the majority of his testimony involved the extrapolation of maps and photographs dating back to 1952. In consideration of the credible and persuasive testimony found elsewhere in the evidence presented by the witnesses who regularly use and travel upon the waters in the Lake Rycade area, this Court need not rely on extrapolations of data, which is a matter of

14

theory only.  Additionally, Mr. Wolfe acknowledged the changing nature of the Atchafalaya Basin and admitted the maps and photographs upon which  he relied are only "general" in nature, which further detracts from his reliance upon maps from decades ago to establish specific determinations as to the actual condition of Slough B or Lake Rycade.

With respect to the testimony of Mr.  Patrick Johnson, this Court observed no obvious attempts to evade questions or otherwise provide testimony that was less than forthright.  However, Mr. Johnson's experience by his own admission indicates he is not necessarily an avid fisherman; rather he is a turkey and deer hunter who lacked the experience, knowledge, or recollection as to the nature of the water bodies involved.  Mr.  Johnson did however confirm hunting tags for alligators have been issued to the hunting club to which he and Mr.  Richard belong in the Lake Rycade area. Likewise, he confirmed hunting and killing those alligators.  Mr.  Johnson's testimony also confirmed that individuals may in fact travel from the northwest area of Lake Rycade to the Atchafalaya River, but he was not sure how high the water had to be.  Lastly, Mr. Johnson testified that during a drought, Lake Rycade would be approximately five feet deep, which is of interest because it is contrary to what was inferred from Mr.  Richard's testimony, yet Mr.  Richard called Mr. Johnson as a witness.

As to the testimony of Mr. Glenn Richard, this Court found him to be less than forthright and not fully credible as a witness.  Mr. Richard's testimony was evasive, contradictory and inconsistent with the greater weight of the testimony of the other witnesses before this Court.  Moreover, it was internally contradictory and otherwise inconsistent with the exhibits presented at the hearing.[3]  For

---

[3]Although Mr.  Richard advanced arguments as to evidence that was not permitted at trial pursuant to the application of Fed. R. Civ. p. 37(c) for the failure to disclose information required by Rule 26(a) or 26(e)(1), the Court finds Richard's arguments unpersuasive on that point.

example, merely by way of illustration, Mr. Richard's October 30, 2006 cross-examination revealed inconsistent testimony as to the value of the hunting camp owned by Mr. Richard. Mr. Richard unequivocally testified he had "no clue" as to the value of his camp, which he maintained had "never been appraised," yet, he nevertheless acknowledged his 2004 personal financial statement in which he clearly reported an extensive value of the camp.[4]

Additionally, Mr. Richard testified he observed bass boats in Lake Rycade, yet later testified he had not seen any vessels other than Jody Meche's vessel. Mr. Richard attempted to distinguish between having "heard" vessels and having "seen" vessels, but this Court did not find that distinction to be persuasive. Suffice it to say this Court did not find Mr. Richard's testimony to be forthright, credible or in any way persuasive; rather, this Court found the testimony to border on if not embrace, the disingenuous.

Lastly, with respect to Mr. Richard's testimony, this Court notes Mr. Richard testified he never attempted to enter Lake Rycade through Slough B by boat. Consequently, he cannot speak to whether one may enter through Slough B by boat or not, notwithstanding attempts to do so.

2.      **Lake Rycade's use, or susceptibility of being used, in its ordinary condition, as a highway of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water.**

As to Lake Rycade's use, or susceptibility of being used, in its ordinary condition, as a highway of commerce over which trade and travel are or may be conducted in the customary modes

---

[4] At this point in time, given the pre-existing request for seal as to certain evidence and the limited inquiry of this aspect of the Motion to Dismiss, the Court will not enter the value of the camp given by Mr. Richard into the record. If in fact this Court finds a sufficient threshold exists to invoke maritime jurisdiction, the seal will be revisited. Nevertheless, for these purposes it is noted Mr. Richard gave a specific value as to his camp, despite his unequivocal testimony that he had "no clue" as to the value of the camp.

of trade and travel on water, this Court looks to the testimony of the witnesses who actually traversed the area and to the testimony of those witnesses who actually crawfished in Lake Rycade as late as 1994 predating certain of the illegal obstructions and threatening actions taken to discourage use. This Court looks to the testimony of Mr. Mason, although not determinative, that the state considered the Lake Rycade waters navigable and felt obliged to maintain the waters for use by fishermen and hunters.

As to the argument made that the seasonal nonnavigability of this area renders it nonnavigable, this Court, as noted above and on the record, follows the analysis set forth in *Sanders*, *supra*, and that Court's conclusion that seasonal nonnavigability is not sufficient to render waters nonnavigable as a matter of law.  The evidence and testimony in this matter establishes the Lake Rycade area within the Atchafalaya Basin is a body of water that is unique.  It is one that is by history and by fact subject to seasonal change and fluctuation.  The mere fact that it is subject to seasonal nonnavigability does not, in this Court's opinion, render it nonnavigable.  Such a finding is buttressed by the evidence establishing that, in fact, the number of days when Lake Rycade is navigable coincide with the crawfish season, which is the activity of commercial nature that is the most likely for that area.

This Court notes the historical nature of this area and the fact that this area has supported a unique social community and has been used for commercial purposes and travel throughout its history, and traditionally and to present day has been and is used as a highway of commerce over which trade and travel have been and are conducted.  Support for this conclusion lies in Steven Meche's testimony as to the use of Lake Rycade throughout his life and more recently travel from one side of the Atchafalaya Basin to the other side in order to find and sell his catch.  Likewise,

17

support for the conclusion that the area is one which has been used as a highway of commerce lies in Mr. Mason's discussion of entering Lake Rycade from the Atchafalaya River using the northwest quadrant of the lake and also traveling from Lake Rycade to the Whiskey Bay Pilot Channel through slough B.

This Court finds that the trade and travel that is performed or that is capable of being performed through the slough B or Meche Bayou into Lake Rycade, is in the customary mode of trade and travel on water for this unique area. There have been multiple vessels to which this Court received testimony that are capable of going through slough B, Lake Rycade, the Whiskey Bay Pilot Channel, and the Atchafalaya River. Those vessels are specifically designed for commercial activity for this area and are used for that commercial activity.

This Court notes that the trade and travel in the Lake Rycade area occurs when these waters form in their ordinary condition. This Court also notes, although it is not determinative of this Court's opinion and ruling, that the ordinary condition, it would seem, would be that condition of a waterway *when not illegally obstructed.* Nevertheless, this Court need not make that determination in this particular matter because this Court finds Lake Rycade is susceptible to and capable of commercial activity and travel despite the continued, deliberate, and ongoing attempt by individuals such as Mr. Estis to obstruct access to Lake Rycade.

This Court has looked to the daily stage levels and charts of the Butte LaRose gauge on the Atchafalaya River which no witnesses dispute and many witnesses testify is what the commercial fishermen in the area use to determine accessibility within the basin. This Court has listened to the testimony of the witnesses who have actually accessed this area, and this Court found those witnesses to be credible.

This Court has looked to a time frame of approximately 18.6 years merely to give the historical data based upon the testimony of Mr. Wolfe, Dr. Kemp, and Mr. Bienvenu.  As the witnesses agreed, this is a unique area of water which is susceptible to cycles, and in order not to have a distorted view, something more than eight years needs to be used.  According to the experts on behalf of plaintiffs and defendant, 18.6 years is the more appropriate period of time.  Although this Court notes the time period chosen does come from the lunar cycle and the natural pull of the tide, which is not necessarily applicable here within the Atchafalaya Basin, the Court finds no reason to depart from the unanimous expert opinions.

Lastly, this Court notes that the Army Corps of Engineers issued a cease and desist order to Mr. Richard when Mr. Richard began digging access from the hunting club to the lake and back to the Atchafalaya River, thus inferring jurisdiction by the Corps.  Likewise, state government agencies used state monies and equipment to maintain Lake Rycade.  As noted above, Mr.  Mason, based on years of working for the Wildlife and Fisheries department, considered Lake Rycade navigable, which was in part why the state spent efforts at maintaining.  Although Mr.  Mason does not have the ability to make that legal determination, his impression that the lake was navigable because the state was spending substantial efforts to maintain the lake is nonetheless significant, as noted in *Sanders, supra*.

3. **Whether the waters of Lake Rycade form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.**

This Court finds the Lake Rycade waters form in their ordinary condition by themselves, or by uniting with other waters, namely the Whiskey Bay Pilot Channel and the Atchafalaya River, a

continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.  This Court again notes the *Sanders* Court's rejection of limiting the relevant time frame for consideration in favor of a more broad period of time.  As discussed more thoroughly above and on the record, this Court will look to the approximate 18.6 year cycle as espoused by Dr. Kemp, Mr. Wolfe, and supported by Mr.  Bienvenu.

Based on the credible and persuasive testimony of both Mr. Steven and Jody Meche and Mr. Mason, this Court finds that Lake Rycade is sufficiently connected to and communicating with the Whiskey Bay Pilot Channel through slough B and also with the Atchafalaya River through the northwest quadrant of Lake Rycade that the waters form or unite with the overall navigable waterways of the United States that are used for commerce on a daily basis, particularly for oil and gas commerce in addition to fishing and hunting.  The Court finds these waterways ultimately make their way through the Vermilion Bay into the Gulf of Mexico, such that they constitute a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.

## CONCLUSION

Based on the applicable law and the factual determinations rendered by the Court on the record at the conclusion of the evidentiary hearing, this Court finds Lake Rycade is used, or is susceptible of being used, in its ordinary condition, as a highway for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on the water.  Further, the Court finds the Lake Rycade waters where the tort occurred constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, because they form in their ordinary condition by themselves, or by uniting with

20

other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___26___ day of February, 2007.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE